NICOLA T. HANNA
United States Attorney
LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division
STEVEN R. WELK
Assistant United States Attorney
Chief, Asset Forfeiture Section
BRENT A. WHITTLESEY (Cal. Bar No. 73493)
Assistant United States Attorney
Asset Forfeiture Section
    Federal Courthouse, 14th Floor
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5421
    Facsimile: (213) 894-0142
    E-mail: Brent.Whittlesey@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>        v.<br><br>$599,600.00 IN U.S. CURRENCY,<br><br>        Defendant. | No. 2:19-CV-00088-JLS(AFMx)<br><br>VERIFIED FIRST AMENDED COMPLAINT FOR FORFEITURE<br><br>21 U.S.C. § 881(a)(6) and<br>18 U.S.C. § 981(a)(1)(A) and (C)<br><br>[HSI] |

    Plaintiff United States of America brings this claim against defendant $599,600.00 in U.S. Currency, and alleges as follows:

JURISDICTION AND VENUE

    1.   This is an in rem civil forfeiture action brought pursuant to 21 U.S.C. § 881(a)(6) and 18 U.S.C. § 981(a)(1)(A) and (C).

2.   This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1345 and 1355.

3.   Venue lies in this district pursuant to 28 U.S.C. § 1395(b).

PERSONS AND ENTITIES

4.   The plaintiff in this action is the United States of America.

5.   The defendant in this action is $599,600.00 in U.S. Currency (the "defendant currency") seized by law enforcement officers from Nicholas Beugg ("Beugg") during the search of a vehicle at 645 South Allied Way, El Segundo, California on August 23, 2017.

6.   The defendant currency is currently in the custody of the United States Customs and Border Protection, Department of Homeland Security, where it will remain subject to this Court's jurisdiction during the pendency of this action.

7.   The interests of Beugg may be adversely affected by these proceedings.

FACTS SUPPORTING FORFEITURE

Nicholas Beugg's Unlicensed Money Transmitting Business

8.   Bitcoin is a form of "cryptocurrency" that is not regulated by any nation.  Bitcoin is held by owners in "virtual wallets" and is traded on the internet.  Transactions in Bitcoin are confirmed through a block chain mathematical formula.

9.   Transactions in Bitcoin are anonymous and unregistered. Bitcoin can be transferred anywhere in the world electronically.  As a result, Bitcoin transactions are often used by persons engaged in laundering of narcotics sales proceeds.

10.  As set forth below, Beugg operated an unlicensed money transmitting business as defined in 18 U.S.C. § 1960, which was engaged in the business of exchanging cash for Bitcoin and Bitcoin for cash.  The operation of Beugg's unlicensed money transmitting business affected interstate and foreign commerce.

11.  Beugg's money transmitting business was operated without an appropriate state or federal license, and involved the transportation and transmission of funds that were known by Beugg to have been derived from criminal offenses or were intended to be used to promote or support criminal activity.

Beugg Bitcoin Account at Bitstamp

12.  Bitstamp is a Bitcoin exchange with its offices in London, England.  On May 1, 2015, Beugg opened a trading account at Bitstamp that enabled him to purchase and sell Bitcoin.  Beugg told Bitstamp that his account would be used for payment of amounts he owed in connection with his on line gaming activity in the game Runescape.

13.  Because the trading activity in Beugg's account was not consistent with on line gaming, Bitstamp asked Beugg for clarification of the purpose of trading in the account.  In particular, Bitstamp asked Beugg to clarify the reason for the deposit of $9,999.99 on July 5, 2015 and $9,999.99 on September 27, 2015, into his account.  Beugg responded that the deposits were from "mass disbursements for all the sales I have done of the site over a months time usually."

14.  Beugg made the following deposits into the Bitstamp account:

| | |
|---|---|
| May 7, 2015  – | $5,000.00 |
| May 14, 2015  – | $9,000.00 |

3

| | |
|---|---|
| August 11, 2015   - | $9,150.00 |
| September 25, 2015  - | $9,000.00 |
| October 13, 2015   - | $9,250.00 |
| October 19, 2015   - | $9,250.00 |
| November 16, 2015  - | $9,500.00 |
| November 30, 2015  - | $9,500.00 |
| December 17, 2015  - | $9,650.00 |

15.  Bitstamp suspected that Beugg was using his Bitcoin account to engage in illegal currency structuring.  On January 8, 2016, Bitstamp notified Beugg that it was closing his account.

Registration of PieG.P. as Money Transmitting Business with FinCEN

16.  On or about July 6, 2015, PieG.P., Inc. was incorporated in Texas with Isaac Arch, an associate of Beugg, as the corporation's registered agent.  Isaac Arch is believed to be an associate of Beugg because PieG.P., Inc. maintained an account at Bank of America with an account number ending 8755 which had a customer address at Beugg's Los Angeles, California home.

17.  On or about July 6, 2017, Beugg, on behalf of PieG.P., Inc., filed a registration form seeking to become a money transmitting business with the U.S. Department of Treasury, Financial Crimes Enforcement Network ("FinCEN"), and, based on information contained on the FinCEN website, thereby became licensed to conduct money transmitting transactions as of that date.  PieG.P., Inc.'s registration listed Nicholas Beugg as the company's owner and Chief Enforcement Officer and listed Beugg's Los Angeles home address as PieG.P., Inc.'s business address.  PieG.P., Inc. is not authorized to conduct business in California as a foreign corporation, and is not licensed by the California Secretary of State or the Texas Department

4

of Banking to operate as a state-licensed money transmitting business.

18. localbitcoins.com is a web site where buyers and sellers of Bitcoins can register and solicit business. Kingtrades created a page on the localbitcoins.com web site under the screen name KingTrades that provided that "kingtrades wishes to sell bitcoins to you" and that KingTrades preferred to meet in coffee shops, banks or public places for transactions. The Kingtrades page listed the KingTrades Wickr address as one of the ways to contact the company. Kingtrades is the Wickr address used by Beugg.

19. Despite the fact that PieG.P., Inc. was a federally-authorized money transmitting business, and could have lawfully conducted the transactions described in this complaint, Beugg conducted the transactions set forth below in his individual capacity, and not through PieG.P., Inc. Beugg never disclosed the existence of PieG.P., Inc. to the participants in the monetary transactions described in this complaint.

Beugg Sale of Bitcoin to a Confidential Informant

20. In March of 2018, agents of the U.S. Department of Homeland Security Investigations ("HSI") interviewed a Confidential Informant ("C.I."), who told them that he had sold marijuana and fentanyl pills through contacts that he made on the "darknet." In addition, the C.I. told HSI agents the following information. The C.I. obtained payment for narcotics by shipments of currency that he received through the U.S. Postal Service ("USPS"). During one year, C.I. received over one million dollars in currency through USPS deliveries. Most of the money was shipped to his box at a UPS store located at 324 South Beverly Boulevard in Beverly Hills, California.

21.   The C.I. wanted to obtain Bitcoin in exchange for cash and the C.I. contacted one Bitcoin seller who used the screen name Kingtrades.  The C.I. identified a photo of Beugg as the person he knew as Kingtrades.  C.I. communicated with Kingtrades through Wickr, a phone messaging application used by persons to communicate anonymously.

22.   The C.I. first met with Beugg at a Starbucks on the corner of Beverly and Charleville in Beverly Hills in early August 2017.  At that time, C.I. purchased approximately $20,000 in Bitcoin from Beugg.  During the meeting, the C.I. told Beugg that he had a large amount of currency that he wished to convert into Bitcoin.  The C.I. asked Beugg if C.I. could purchase another $30,000 in Bitcoin.  Beugg agreed to sell additional Bitcoin.  The C.I. left the meeting with Beugg, retrieved another $30,000 in cash, returned to meeting with Beugg, and exchanged the $30,000 for additional Bitcoin.

23.   The C.I. met with Beugg on numerous occasions from early August 2017 to mid-September 2017, sometimes in the lobbies of the Peninsula Hotel and Beverly Hills Hotel.  The C.I. usually purchased $50,000 of Bitcoin from Beugg during each meeting.  The C.I. purchased a total of between $500,000 and $600,000 in Bitcoin from Beugg.  Beugg quit responding to the C.I.'s Wickr messages in mid-September 2017.

24.   The C.I. noticed that Beugg did not talk much when they met.  Beugg appeared to be paranoid and conducted "counter-surveillance" by constantly looking around.

HSI Purchase of Bitcoin from Beugg

25.   In February 2017, HSI Special Agents executed search and arrest warrants pertaining to D.S. on federal money laundering and

6

1   narcotics charges.  D.S. operated a Wickr account that he used for

2   Bitcoin transactions related to his criminal activity.  D.S. agreed

3   to turn over his on-line accounts, including his Wickr account

4   (hereinafter "UCA Wickr account"), to HSI Special Agents for use in

5   undercover investigations.

6       26.  Later in 2017, a U.S. Department of Homeland Security

7   Investigations ("HSI") Special Agent in Denver, Colorado, started

8   using the UCA Wickr account screen name in an undercover capacity.

9   The undercover agent ("Denver UCA") used the screen name to identify

10  additional subjects who wished to engage in money laundering

11  transactions.

12      27.  In August 2017, the Denver UCA contacted HSI agents in

13  Orange County, California about a subject (hereinafter "KOB") who was

14  interested in purchasing Bitcoins for cash.  KOB communicated with

15  the Denver UCA through the Wickr phone texting application.  KOB

16  stated that he had an unknown buyer (hereinafter "Unidentified

17  Buyer") who wanted to purchase up to $1 million of Bitcoin.  KOB

18  asked the Denver UCA if he could conduct such a large transaction and

19  texted a photo of what appeared to be a large amount of U.S. currency

20  on a bed to the Denver UCA as proof that Unidentified Buyer had the

21  amount of money to complete the transaction.

22      28.  The Denver UCA told KOB that he could conduct the

23  transaction, and asked Unidentified Buyer to meet him (the Denver

24  UCA) in Cypress, California.  KOB  confirmed that they could meet in

25  Cypress, California, and asked if Wednesday (August 23, 2017) would

26  be a good date.  The Denver UCA agreed.  KOB stated that Unidentified

27  Buyer would first do a $100,000 cash for Bitcoin transaction to make

28  sure that the UCA would complete the transaction, and then

Unidentified Buyer would retrieve the remaining $900,000, bring the money back to the Denver UCA on the same day, and complete the $1 million cash for Bitcoin transaction.

29.   On or about August 21, 2017, KOB  contacted the Denver UCA via Wikr to confirm the August 23, 2017 meeting.   The Denver UCA confirmed the meeting location and time.   KOB also stated that Unidentified Buyer had inquired whether, after they completed the $1 million transaction, the Denver UCA could sell another $3 million of Bitcoin.   The Denver UCA told KOB that he wanted more details and asked KOB if this was a set up.   KOB stated it was not a set up and stated that Unidentified Buyer would contact Unidentified Buyer's "partner" to conduct the larger transaction.

30.   On August 22, 2017, KOB contacted the Denver UCA to ask if he could send a photo of a Bitcoin wallet to prove that the Denver UCA could handle such a large transaction.   KOB stated that because Unidentified Buyer had sent a photo of the cash, Unidentified Buyer wanted a photo of a Bitcoin wallet in return.   The Denver UCA sent a photo of a Bitcoin wallet to KOB for confirmation, but KOB stated he could not open the photo in the Wickr application.   KOB then texted his cell phone number and asked the Denver UCA to send the photo to that number.

31.   A Los Angeles-based HSI Special Agent, also acting in an undercover capacity ("LA-UCA") then texted the Bitcoin wallet photo to KOB's cell phone.

32.   Later in the day, KOB contacted the Denver UCA to ask if he could meet Unidentified Buyer closer to the Los Angeles area.   The Denver UCA agreed, and told KOB that they could meet in Manhattan

Beach, California.   The Denver UCA told KOB he would text a location
on the day of the meeting.   KOB agreed.

33.   On August 23, 2017, the Denver UCA texted KOB to meet at
noon at a Starbucks located at 2005 Park Place, El Segundo,
California.

34.   Shortly after, KOB texted the Denver UCA confirming
Unidentified Buyer was heading to the meeting.   KOB described
Unidentified Buyer as a "skinny white guy" wearing a "black shirt and
jeans."   KOB then stated that Unidentified Buyer would do "100k and
then 800k" now and that if it went well, he would "reach his client
to do another 3m [$3,000,000] on his behalf."   KOB also told the
Denver UCA that the sale price for the Bitcoin would be "1%
Bitstamp," meaning one percent higher than the market price for
Bitcoin quoted by Bitstamp Ltd., a Bitcoin exchange based in London,
England and mentioned in paragraph 10 above.   KOB then sent
Unidentified Buyer's Bitcoin wallet address.   KOB also texted
Unidentified Buyer's phone number to the LA-UCA.

35.   Shortly after noon, agents observed a young white male
wearing jeans and a black shirt, later identified as Beugg, carrying
a green shopping bag walk up to the Starbucks located at 2005 Park
Place in El Segundo, California.   Beugg looked around for a few
minutes, and then sat down at a table outside in front of the
Starbucks.   Approximately ten minutes later, the LA UCA walked up to
the Starbucks and met with Beugg. The following is a summary of their
conversation.

36.   The LA UCA introduced himself to Beugg as "Sam" and asked
if he wanted anything from Starbucks.   Beugg stated that he was
"good."

37.   The LA UCA told Beugg that "his guy" stated that he would be charging 1% and asked whether that was agreeable to Beugg.   Beugg agreed.   The LA UCA asked Beugg for his Bitcoin wallet information so that he could compare it to the wallet that KOB sent the Denver UCA. The LA UCA explained that it was to make sure that they were sending the Bitcoin to the right person.

38.   Beugg then showed his phone with the Bitcoin wallet information to the LA UCA.

39.   The LA UCA then told Beugg that the Denver UCA would be sending one dollar to Beugg's wallet first to make sure it was the right one, and then he would send the balance of the Bitcoin when the transaction was confirmed.

40.   Beugg then said, "So [Denver UCA] is the one that has it [the Bitcoin]?"   The LA UCA confirmed it was the Denver UCA who had the Bitcoin, and stated that he (the LA UCA) was there to meet to pick up the money.   The LA UCA then told Beugg he could text the Denver UCA via Wickr.

41.   Beugg then stated that the person he was texting concerning the purchase of Bitcoin was not the Denver UCA.   The LA UCA stated that Beugg was talking to another person, KOB, who was texting the Denver UCA.   Beugg then observed there were "two middlemen here."

42.   The LA UCA told Beugg that the Denver UCA sends him out when they are dealing with new people.

43.   Beugg then stated, "I'm talking to a guy who's talking to [the Denver UCA} who's talking to you."   The LA UCA confirmed that was correct.

44.   The LA UCA then asked Beugg whether he was buying Bitcoin at the "spot rate."   Beugg responded that he thought what was

1    happening was that he would be buying Bitcoin at the spot rate "plus
2    1."  Both Beugg and the LA UCA agreed and concurred that the spot
3    rate would be "Bitstamp."

4        45.  Beugg then looked on his phone for the current Bitcoin
5    price quoted by "Bitstamp" and stated that it was "4123," meaning
6    $4,123 per Bitcoin.  The LA UCA agreed and told Beugg to Wickr the
7    Denver UCA to confirm.

8        46.  Beugg then walked away from the table, spoke to someone on
9    his cell phone for a few minutes, and returned to the table.

10       47.  The LA UCA asked Beugg if he was "cool" and if the Denver
11   UCA got back to him.  Beugg told the LA UCA that he had not contacted
12   the Denver UCA  yet and that he was talking to someone else.

13       48.  Beugg then asked the LA UCA whether the Denver UCA was a
14   Bitcoin trader.  The LA UCA confirmed that the Denver UCA was a
15   trader and that he (the Denver UCA) sent the LA UCA to meet with new
16   people to make sure it was "cool."  The LA UCA asked Beugg whether
17   his contact had mentioned anything about the Denver UCA.  Beugg
18   stated that "some other guy" told him not to trade with the Denver
19   UCA.  The LA UCA asked Beugg why.  Beugg responded that he had been
20   told the Denver UCA was involved in "seizures or something."  The LA
21   UCA told Beugg he did not know about seizures, but that Beugg's
22   person (KOB) was the one that set up the meeting.  Beugg agreed.

23       49.  The LA UCA asked Beugg if he wanted to talk to "his guy."
24   Beugg asked the LA UCA how he wanted to conduct the transaction.
25   Beugg asked if the LA UCA wanted him to show the LA UCA the cash and
26   then  the Denver UCA would send the Bitcoin. The LA UCA confirmed
27   that the Denver UCA would send Beugg Bitcoin with a value of one
28   dollar initially as a test.  Once Beugg confirmed that he had

1   received the Bitcoin, the Denver UCA would send Bitcoin with a value

2   of $100,000.00.

3       50.   Beugg then opened up the green bag to show the LA UCA the

4   cash inside.   The LA UCA visually confirmed there was cash in the

5   bag.   The LA UCA then contacted another agent, who in turn contacted

6   the Denver UCA.   The Denver UCA then sent Bitcoin with a value of one

7   dollar to Beugg's Bitcoin wallet.

8       51.   While they were waiting, the LA UCA went into Starbucks to

9   purchase a cup of coffee.   When the LA UCA returned from the purchase

10  of coffee, Beugg confirmed he received a transaction of 0.00024

11  Bitcoin.

12      52.   The LA UCA told Beugg that he was going to have "him" send

13  the rest.

14      53.   Beugg then asked what "rate" the LA UCA normally sold

15  Bitcoin.   The LA UCA told Beugg that it was usually different every

16  time, but for large transactions, the Denver UCA would sell at a

17  favorable price.

18      54.   Beugg then asked the LA UCA if he could "take any amount,"

19  meaning sell any amount of Bitcoin that Beugg wanted to purchase.

20  The LA UCA stated that this was a big exchange and that they had to

21  consolidate, and that he had not seen this large a purchase

22  transaction recently.   The LA UCA told Beugg that they nevertheless

23  could handle large transactions.

24      55.   The LA UCA told Beugg that after the meeting, the LA UCA

25  would leave to count the money, and then he could meet again with

26  Beugg later at the Starbucks.   Beugg stated he lived about a thirty

27  minutes' drive from the Starbucks and agreed that he would come back

28  to conduct a second meeting.

56.   The LA UCA then asked Beugg if he did "a lot of this [purchases of Bitcoin]."  Beugg responded that he did.

57.   The LA UCA told Beugg that the Denver UCA was sending the rest of the Bitcoin.  Beugg then asked if the LA UCA had a money counter.  The LA UCA stated that he had one at his house.

58.   The LA UCA asked Beugg if he used one (money counter) to count it.  Beugg responded that he did.  Beugg stated that it was all hundreds organized into banded stacks of $10,000.  Beugg stated that there were ten stacks.

59.   The LA UCA then asked Beugg if he texted the Denver UCA the spot rate.  BEUGG responded that he used the current Bitstamp exchange rate which was $4,125.16 per Bitcoin.  The LA UCA asked Beugg if they were to send 24 Bitcoin.  Beugg responded that he was owed 24.0015 Bitcoin.  The LA UCA then contacted another agent, who in turn contacted the Denver UCA to send 24.0015 Bitcoin to Beugg.

60.   The LA UCA then asked Beugg if all of the Bitcoin was for him.  Beugg responded, "sort of."  The LA UCA told Beugg he was just asking because it was such a big amount.

61.   Beugg confirmed he received the Bitcoin, and then handed the green bag containing $100,000.00 to the LA UCA.  Beugg told the LA UCA to confirm there were ten stacks of currency.  The LA UCA looked into the bag and confirmed he counted ten stacks.  The LA UCA then asked Beugg if he wanted to wait at Starbucks until the Bitcoin transaction was confirmed.  Bitcoin transactions require a number of confirmations, which can take as long as an hour.  BEUGG stated he would wait for at least the first confirmation.

62.   The LA UCA asked Beugg if they wanted to meet back at the Starbucks around 2:15 p.m.  Beugg confirmed the time with the LA UCA.

63.   Beugg then confirmed he received all of the Bitcoin and agreed to meet back at the Starbucks.

64.   At approximately 1:39 p.m., the Denver UCA received a Wickr message from KOB stating that "just traded with you" and "your guy told me to message you."

65.   Beugg then left the Starbucks, got into a dark gray Toyota Prius bearing California license plate 7NLV765, and left the area.

66.   Agents determined that the Toyota Prius was registered to an owner at an address in the Cheviot Hills neighborhood of Los Angeles, California ("Cheviot Residence").  Agents determined that Nicholas Beugg resided at the same address, and obtained a California driver's license photograph of Nicholas Beugg.  The LA UCA looked at the photograph of Nicholas Beugg and confirmed that it was the same person he had met with at Starbucks in El Segundo.

Cheviot Hills Surveillance

67.   Agents then followed Beugg to the Cheviot Hills Residence. They observed Beugg get out of his car and walk into the house.

68.   A few minutes later, agents observed Beugg leave the house with a small bag in his hand and get into the Toyota Prius.  Agents followed Beugg as he drove to a Wells Fargo Bank and saw Beugg go into the bank with the small bag.

69.   Agents watched Beugg leave the bank with the small bag, get back in his car, and drive back to the Cheviot Residence.  Beugg went back into the residence with the small bag.

70.   At approximately 3:00 p.m., agents saw Beugg leave the residence, get into the Toyota Prius and drive away.  As the surveillance team was following Beugg, they noticed Beugg talking on

his cell phone while driving, driving slowly, then speeding up, and
making turns without signaling.

71.   Due to his erratic driving, Officer Jeff Hunziger from Brea
Police Department ("BPD"), who was part of the surveillance team,
conducted a traffic stop of Beugg.  Officer Hunziger was wearing his
patrol uniform driving a marked BPD Police Car.  Officer Hunziger
first observed Beugg's Toyota Prius driving southbound on South
Sepulveda Boulevard in the City of El Segundo.  Officer Hunziger
observed the vehicle make several lane changes and pull into the left
hand turn lane for South Hughes Way.  As Beugg made the left turn on
a green light, Officer Hunziger proceeded to activate his overhead
light to initiate a vehicle stop.  Beugg continued driving for a
short time before yielding.

72.   Officer Hunziger approached the Prius, contacted Beugg,
asked for Beugg's license and registration, and explained the reason
for the stop.  Beugg removed his license from his wallet and handed
the license to Officer Hunziger.  Beugg then reached into the glove
box of the vehicle and handed Officer Hunziger a W-2 tax form.  Beugg
also advised Officer Hunziger that the vehicle did not belong to him.

73.   Officer Hunziger told Beugg that the document he handed him
was not his registration.  Beugg then preceded to hand Officer
Hunziger a stack of paper and told him, "It's in here somewhere."
Officer Hunziger told Beugg that he was not going to dig through the
stack of paperwork, and asked Beugg to step out of the vehicle.  As
Beugg exited his vehicle, Officer Hunziger observed Beugg acting
extremely nervous to the point where he was shaking.  Officer
Hunziger noted that Beugg attempted to lock the vehicle with his key

1    fob after he got out of the Prius, but apparently as a result of his

2    nervousness, Beugg actually unlocked the vehicle.

3        74.   Officer Hunziger then conducted a field test on Beugg to

4    check for any impairments, and asked him to sit down on the curb near

5    his vehicle.  Officer Hunziger attempted to talk with Beugg and asked

6    him where he was going when he was stopped.  Beugg responded he would

7    rather not answer.  Based on his experience in dealing with numerous

8    people in various situations during traffic stops, Officer Hunziger

9    found Beugg to be extremely evasive and that Beugg acted strangely

10   during their interaction.

11       75.   Officer Hunziger then asked Beugg if he had anything

12   illegal in the vehicle.  Beugg responded that he did not consent to a

13   search of the vehicle.  Officer Hunziger told Beugg that he did not

14   ask him for permission to search the vehicle and that he simply

15   wanted to know if there was anything illegal in his vehicle.

16       76.   Another task force officer, Eric Frank, then arrived on the

17   scene to assist Officer Hunziger.  Officer Hunziger explained to

18   Beugg that he was going to run his narcotics-trained and certified

19   canine, Jarvis, around the exterior of the vehicle.  Officer Frank

20   then observed Beugg become more nervous.  Beugg began to look around

21   and over his shoulder from his seated position.  Officer Frank

22   observed that Beugg's body became rigid and Beugg began breathing

23   heavily.  Beugg again stated to the officers that he did not consent

24   to a search of the vehicle.  The officer explained to Beugg that

25   although he understood that he was refusing a search of the vehicle,

26   the officers still had a right to run a narcotics detection canine

27   around the exterior of the vehicle.

28

77.   Canine Jarvis is a six year old Netherland bred Belgian Malinois. Jarvis was imported by Adlerhorst International in Riverside, California and began training with Officer Hunziker in May 2015. Canine Jarvis and Officer Hunziker completed a 240 hour patrol course through Adlerhorst International.

78.   Canine Jarvis and Officer Hunziker were trained in illegal drug odor detection by Eric Oden, a retired Brea Police Officer. Canine Jarvis was trained in the odors of methamphetamine, MDMA, heroin, and cocaine.  When Canine Jarvis locates the odor of any of the illegal drugs, he will paw/scratch near or at the source of the odor.  This may also include any items contaminated with the odor of any of these illegal drugs.  Canine Jarvis and Officer Hunziker have been certified in illegal drug detection through California Narcotic Canine Association and maintain that certification on a yearly basis.

79.   Prior to running the canine around the vehicle, Officer Hunziger walked around the Prius and looked through the windows to identify any hazards on which the canine might injure himself or ingest.  While conducting the canine safety check, Officer Hunziger observed a large black plastic bag sitting on the front passenger floorboard.  Officer Hunziger could clearly see in plain view what appeared to be a large amount of U.S. currency bundled up inside the bag.  Officer Hunziger asked Beugg what the money was for.  Beugg responded that he was going to "plead the Fifth."

80.   Officer Hunziger then had the canine, Jarvis, conduct an exterior sniff of the Prius.  Officer Hunziger noted that Jarvis alerted to the front passenger door seam as well as the rear passenger door seam.  Based on the exterior alert to a narcotics odor on the Prius, Officer Hunziger directed Jarvis to conduct an interior

sniff of the Prius.  Officer Hunziger then noted that Jarvis alerted to the black plastic bag on the front passenger floorboard and alerted to the rear passenger floorboard behind the front passenger seat.

81.  While Officer Hunziger conducted the canine sniff, Officer Frank attempted to ask Beugg some questions.  Beugg refused to identify himself and stated that he wanted to plead the Fifth.

82.  At the conclusion of the canine sniff, Officer Hunziger searched the areas where Jarvis had alerted.  On the front passenger floorboard, Officer Hunziger located a black plastic bag containing a large amount of bulk U.S. Currency (i.e., part of the defendant currency).  Officer Hunziger then searched the rear passenger floorboard and located a white paper bag with an Apple Computer logo on it.  Officer Hunziger found a large amount of bulk U.S. Currency in the bag (i.e., the remainder of the defendant currency).  Officer Hunziger then informed Officer Frank what he found.

83.  Officer Frank inspected the bags and noticed that a majority of the bulk U.S. Currency was rubber banded together and appeared to be circulated currency.  The currency was not banded with paper bands, as it would have been had it been recently withdrawn from a bank.  Officers found it highly unusual that Beugg would be carrying what appeared to be a large amount of currency with him in his vehicle.

84.  Officers asked Beugg if the currency belonged to him, but Beugg again refused to answer.  Based on his unwillingness to answer any questions and the results of the canine sniff, officers believed that Beugg was engaging or about to engage in illicit activity.

85.   Officers provided a property receipt to Beugg listing the items that they seized.   Beugg refused to sign the receipt.   Officers subsequently wrote, "Refused" in the signature box.   Officers released Beugg from the scene pending further investigation.

**FIRST CLAIM FOR RELIEF**

86.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 85 above.

87.   Based on the above, plaintiff alleges that the defendant currency represents or is traceable to proceeds of illegal narcotic trafficking or was intended to be used in one or more exchanges for a controlled substance or listed chemical, in violation of 21 U.S.C. § 841 et seq.   The defendant currency is therefore subject to forfeiture pursuant to 21 U.S.C. § 881(a)(6).

**SECOND CLAIM FOR RELIEF**

88.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 85 above.

89.   Based on the above, plaintiff alleges that the defendant currency constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1960, which is a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B).   The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C).

**THIRD CLAIM FOR RELIEF**

90.   Plaintiff repeats and realleges each and every allegation set forth in paragraphs 1 through 85 above.

91.   Based on the above, plaintiff alleges that the defendant currency is property involved in a transaction or an attempted transaction in violation of 18 U.S.C. § 1960, or property traceable

to such property.   The defendant currency is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays:

(a)  that due process issue to enforce the forfeiture of the defendant currency;

(b)  that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)  that this Court decree forfeiture of the defendant currency to the United States of America for disposition according to law; and

(d)  for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

DATED: April 2, 2019                NICOLA T. HANNA
                                    United States Attorney
                                    LAWRENCE S. MIDDLETON
                                    Assistant United States Attorney
                                    Chief, Criminal Division
                                    STEVEN R. WELK
                                    Assistant United States Attorney
                                    Chief, Asset Forfeiture Division


                                      /s/ Brent A. Whittlesey____
                                    BRENT A. WHITTLESEY
                                    Assistant United States Attorney
                                    Asset Forfeiture Section

                                    Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

1

                              VERIFICATION

2      I, Jared Harada, hereby declare that:

3      1.   I am a Special Agent with the U.S. Department of Homeland

4 Security Investigations.

5      2.   I have read the above Verified First Amended Complaint for

6 Forfeiture and know its contents.  It is based upon my own personal

7 knowledge and reports provided to me by other law enforcement agents.

8      3.   Everything contained in the Verified First Amended

9 Complaint is true and correct, to the best of my knowledge and

belief.

10

11     I declare under penalty of perjury that the foregoing is true

and correct.

12

13     Executed on April 2 , 2019, in Los Angeles, California.

14

15                              _____
                                JARED HARADA
                                Special Agent
16                              U.S. Department of Homeland
                                Security Investigations

17

18

19

20

21

22

23

24

25

26

27

28

                                    21